524 P.2d 1021

William E. TERREL, d/b/a Little Tree
Lumber Company, Plaintiff-
Cross Appellant,

v.

DUKE CITY LUMBER COMPANY, INC., a
New Mexico corporation, Joe Grevey, Jack
Grevey and Ira Liberman, Defendants-Ap-
pellants,

and

Jo Dell TERRELL, Third-Party Defendant-
Cross Appellant.

No. 878.

Court of Appeals of New Mexico.

May 22, 1974.

Certiorari Granted July 11, 1974.

Hernandez, J., concurred specially and
filed opinion.

Sutin, J., dissented from denial of mo-
tion to remand and filed opinion.

William E. Snead, Arturo G. Ortega, Albuquerque, for plaintiff-cross-appellant.

Charles P. Reynolds, Albuquerque, David Eldon Douglas, Edmund H. Kase, III, Socorro, for third-party defendant-cross-appellant.

John R. Cooney, George T. Harris, Jr., Modrall, Sperling, Roehl, Harris & Sisk, Albuquerque, for defendants-appellants.

## OPINION

HENDLEY, Judge.

The jury returned a verdict against defendant, Duke City, in the sum of $635,458.50, on the theory of breach of contract and economic compulsion. The trial court granted Judgment N. O. V. to Duke City in the sum of $175,607.00. Duke City had previously been granted summary judgment on certain promissory notes in the sum of $344,174.19, " * * * subject, however, to any sums which may be awarded plaintiff. * * * " The trial court denied Duke City any interest or attorneys' fees " * * * on the sum of money for which summary judgment was entered. * * * "

Defendant appeals and plaintiff cross-appeals from the various judgments and rulings of the trial court. We affirm.

The charge of economic compulsion, like fraud, is one easily made. See Frear v. Roberts, 51 N.M. 137, 179 P.2d 998 (1947). It must therefore be proven by clear and convincing evidence. See Chatfield v. City of Seattle, 198 Wash. 179, 88 P.2d 582, 121 A.L.R. 1279 (1939); Carroll v. Fetty, 121 W.Va. 215, 2 S.E.2d 521 (1939), cert. denied, 308 U.S. 571, 60 S.Ct. 85, 84 L.Ed. 479 (1939).

Plaintiff would have us follow the substantial evidence review standard for "clear and convincing evidence" cases set forth in Sauter v. St. Michael's College, 70 N.M. 380, 374 P.2d 134 (1962) which states:

"It is a well settled rule that this court, on appeal, will * * * view the evidence in an aspect most favorable to the judgment and the party prevailing below. * * * [T]he weight of the evidence is not considered on appeal, rather only, if there is any substantial evidence to support the verdict. * * *"

*Sauter* has not been followed in this regard. Hockett v. Winks, 82 N.M. 597, 485 P.2d 353 (1971); McLean v. Paddock, 78 N.M. 234, 430 P.2d 392 (1967); Visic v. Paddock, 72 N.M. 207, 382 P.2d 694 (1963); see Lumpkins v. McPhee, 59 N. M. 442, 286 P.2d 299 (1955).

The above cases conform with the ordinary rules of review of the record on appeal. That is, presumptions are in favor of verdicts and reviewing courts will view the facts in the light most favorable to the prevailing party, will indulge in all reasonable inferences in support of the verdict, and will disregard all inferences or evidence to the contrary. Further, it is for the jury and not the reviewing court to weigh the testimony, determine the credibility of witnesses, reconcile inconsistent or contradictory statements of witnesses and say where the truth lies. Durrett v. Petritsis, 82 N.M. 1, 474 P.2d 487 (1970); Sauter v. St. Michael's College, supra. We will review the evidence to determine if it is sufficient to establish, clearly and convincingly, the claim of economic compulsion. Hockett v. Winks, supra.

We summarize as briefly as possible the facts contained in the 5,933 page record and the legion exhibits. Briefs—617 pages.

FACTS:

*History and Negotiations*

The Terrel family had been in the sawmill business in the Magdalena, New Mexi-

co area for many years. By 1965 plaintiff, as the surviving member, had expanded the sawmill at a cost of $250,000.00 to $300,000.00. In November, 1966 plaintiff lost his inventory of logs by fire and subsequently was hard pressed for working capital. The situation was further compounded for plaintiff by a "way above regular" snow in late 1967 which completely shut down all logging operations until well into 1968. Plaintiff's self-prepared balance sheet as of June 30, 1968 showed total assets of $798,784.33 less total liabilities of $265,605.52 with a resulting equity of $533,178.81. Of the total assets $63,804.33 were current assets, $699,200.00 were fixed assets and $35,780.00 were other assets.

Duke City operated a lumber wholesale and molding manufacturing business in Albuquerque, New Mexico. It also owned three sawmills which were used to produce its own lumber.

During August, 1968 plaintiff met with the principal officers of Duke City to discuss his various financing needs. At that time Ira Liberman, the Executive Vice-President of Duke City, prepared a contract draft of what was discussed in the way of financing, except as to working capital. Terrel planned to get working capital loans from outside sources. (See "Working Capital" infra).

Plaintiff then inquired if Duke City could advance some money on the tentative agreement, since time was short before the unproductive winter months. Duke City informed plaintiff that no funds could be released until all the required documents had been prepared.

*Contract*

Subsequently, on October 16, 1968 the contract between Duke City and plaintiff was signed. Under that contract Duke City agreed to loan Terrel $160,000.00, $127,000.00 of which went directly to pay Terrel's existing debts and $33,000.00 to Terrel himself. Terrel agreed to pay back the debt plus ten percent interest in twenty-four months, paying twenty-five percent of the value of all rough green lumber delivered to Duke City through January 31,

1969 and fifty percent thereafter. As security for the note Duke City encumbered all of Terrel's manufacturing and rolling equipment, taking a second lien on some items. Duke City also had Terrel place the leases covering the Magdelena Mill and all Forest Service timber contracts, then operative or after acquired, in escrow. On default Duke City had the right to foreclose upon Terrel's equipment and to take over his leases and his timber contracts (included in the latter were prepaid deposits, accruals, roads and camps.)

Terrel also promised to ship to Duke City, for the term of the contract plus three years, " * * * all of the rough green Ponderosa Pine shop and better [grades of timber] developed from his mill * * *" on Duke City's grade and tally under the rules of [WWPA] Western Wood Products Association. The price paid by Duke City was tied to Random Lengths Report (See "Market Conditions," infra) and adjusted quarterly. Duke City would also buy, at prevailing wholesale market prices, 100 percent of all other common and dimension lumber (lower grades), of whatever species produced by Terrel during the term of the contract. Duke City was to receive a five percent wholesale commission and a two percent cash discount ten days from the date of invoice.

Terrel was to be in default:

"a. If at any time in three successive months the sawmill production [was] below 500 MBF [thousand board feet] per month;

"b. If Terrel default[ed] in the performance of any of the terms and conditions of [the] contract;

"c. If Terrel [became] insolvent or bankrupt;

"d. If Terrel fail[ed] to maintain his insurance, leases or real estate or forest service contracts in good standing;

"e. If Terrel remove[d] from the Magdalena Mill any of the personal property listed on Exhibit 'A' without prior written approval of Duke;

"f. If for any reason Terrel die[d], or

"g. If the said note and security agreement [were] not paid according to their tenor."

The contract had an acceleration clause. On sale of the mill Duke City had a right of first refusal and an option to terminate the contract or continue with the new buyer.

Finally Duke City had the right to inspect all of Terrel's sales and production records and have a "resident representative" at the Magdalena mill.

*Beginning Operations under Contract*

Plaintiff did not start shipping lumber to Duke City until the early part of December, 1968. He stated his reason for this as follows:

"I had contacted a contract logger. In fact, I contacted him in August shortly after it had been agreed by all concerned that we could make a deal. At this time, his loggers were ready to go to work, and at this time, this is one of the reasons I was anxious to get the contract signed and to get the money to where I could put them in the woods and commence building roads and commence getting in logging and skidding logs and working in general when I was able to. These people took on another short contract while they were waiting for me to obtain funds to where I could keep them working, or start them to working. After I signed the contract, I called them and told them, 'Let's go.' And they said that they would be a week or so before they could clean up this deal they were on. 'We will be there as soon as we can get this operation cleaned up.' Consequently, it was in the middle of November when they did show up and begin logging."

*Working Capital*

Terrel attempted to secure inventory financing for working capital purposes elsewhere. One company agreed to provide it if Duke City would agree to guarantee the financing. Duke City earlier informed

plaintiff that it would make the guarantee, however, in the latter part of January, 1969 it said " * * * that they would be unable or that they would not guarantee * * *" outside lenders working capital agreements and that they decided " * * * they [Duke City] would go ahead and supply the necessary working capital. * * *" Up to this time, Duke City had made working capital advances of $60,000.00 to $75,000.00 and had taken a security agreement on all present and future lumber and log inventory. Duke City had been crediting twenty-five percent of the price of the upper grade lumber shipped to it on the original indebtedness and the balance of seventy-five percent was credited toward the working capital advances. After Duke City agreed to furnish working capital Terrel ceased to look for outside funds, with the approval of Duke City. Duke City, through Liberman, stated to Terrel that as long as Terrel produced, the working capital would be available.

The amount of money advanced for working capital was strictly determined by the value of the inventory. Plaintiff received no direct payment on lumber other than the advances of working capital. Terrel executed a series of promissory notes for the advances of working capital but as they were paid off they were never cancelled.

The amount of working capital was based on plaintiff's inventory of logs in the woods, logs in the yard and lumber bundles figured at 1,700 board feet per bundle. After Duke City agreed to furnish working capital it " * * * established a factor of 1500 feet per bundle, for purposes of inventory count." Subsequently, plaintiff increased the size of the bundles from forty-two inches high to as high as " * * * fifty and fifty-five inches high." These bundles were the common and dimension lumber stacked in the drying yard (to reduce moisture content) prior to processing in the planing mill (where the boards were surfaced). No inventory was made by Terrel of the upper grade rough lumber because it was shipped to Duke City as soon as it was sawed in a sufficient amount to make a load.

*Planing Mill*

Plaintiff did not begin operating his planing mill until April, 1969. The reasons for the delay were: First, due to wet winter conditions it was March before any lumber had air-dried sufficiently to surface, and, second, Liberman advised plaintiff to build a substantial inventory in the drying yard before starting the planing mill. Before plaintiff could begin continuous operation of the planer he had to perform three or four days of work on it. Such maintenance is not unusual after the equipment has been idle for several months.

After plaintiff had made several shipments of surfaced common and dimension lumber, Duke City told plaintiff he would have to make considerable repairs to the planer. Plaintiff stated:

" * * * The only thing that was wrong with it was that it had a slight washboard, a slight wave or a ripple, but it was very slight. It was not severe enough to downgrade the lumber. I knew what was wrong and I had already taken steps to correct it."

Plaintiff had the same lumber grader working for him since 1963 and had no surfaced lumber turned down by a buyer during that period of time. The grader also stated that the slight washboard was not serious enough to downgrade the lumber.

Liberman told plaintiff that unless he reworked the planing mill they would not take any more surfaced lumber or advance any more money. Shortly before the signing of the Supplemental Agreements Duke City sent its planing supervisor to plaintiff's mill and the planer was shutdown for fifteen days. Plaintiff stated that by replacing two $60.00 bearings, which had been ordered, he could have eliminated the washboard effect with no more than one day's shutdown time, and could have produced surfaced lumber during the fifteen

day period. During the shutdown the planing mill employees were not able to work or produce any surfaced lumber. Also, Duke City's planing supervisor made substantial modifications which were not necessary.

The shutdown occurred during plaintiff's best production period. Shortly after the repair work on the planing mill plaintiff was shipping all of his lumber in the rough green state, thus obviating the need for the repairs. (See "Supplemental Agreement Background", infra).

Prior to being shutdown for the planing mill repairs plaintiff's planing mill was processing forty to fifty M.B.F. per day of surfaced lumber. The sawmill, a completely separate operation, was producing between thirty and thirty-five M.B.F. per day.

*Drying Yard*

During the same period of time plaintiff was told by Duke City that he was losing a large percentage of his common and dimension lumber between the time the logs were sawed and the lumber was surfaced and stacked in bundles for shipping. Duke City said a mill study showed plaintiff was losing 100,000 board feet out of every 300,000.

Plaintiff stated he had not been losing more than one to two percent on breakage, and that the most profitable part of his operation was in surfaced lumber.

Duke City insisted plaintiff ship all his lumber in the rough green condition to them.

" * * * At this point whenever I refused they said, 'Well, in this case, if you won't co-operate we are through. We won't advance you any more money or take any more lumber or anything else' and I said, 'Well we have got a pretty good inventory down there and it is going to be quite a loss to everybody concerned. If you will give me two weeks, I will reconstruct my drying yard and I will put it in shape and at that time if you don't agree that this is as good as any-

bodys [sic], anybodys trams or runners where the bundles are stacked to dry.' I asked for two weeks and they said 'OK', Joe [Grevey], Jack [Grevey] and Ira [Liberman] said 'We will give you two weeks, and at the end of this time if it is acceptable you can go ahead and operate the way we are. If it is not, the lumber comes in rough green state.'

"Q. Alright now, in so far as your drying yard was concerned before you made any of these changes they were requiring, were you having any problem in fact with your drying operation?

"A. Not really, not as far as I was concerned. It was the same method I had followed for a large number of years."

Plaintiff then spent the next two weeks using as many as ten men to rework one area of the drying yard. After the reworking of the drying yard, during the latter part of May or early part of June, 1969 plaintiff stated: "I wound up with the very same thing I had except these trams [wood supports] were nailed together. The trams that I was using were not nailed together." Plaintiff never got to use the rebuilt drying yard as he was " * * * forced into a deal that stopped [him] from keeping the lumber on [his] yard." (See Supplemental Agreement Background, infra).

*Timber Contracts*

Plaintiff secured logs for his sawmill primarily by contract with the United States Forest Service. These "sales" were obtained by competitive bidding. Some of the sales were at a flat rate, per M.B.F., while others contained an escalation provision computed by a mathematical formula from a current market index. A part of every sales contract, in addition to the stumpage (log) cost, is the cost of building logging roads and clean up of the logged area.

Plaintiff started logging the Slaughter sale in November, 1968. In February, 1969 the Forest Service prohibited plaintiff's

logging because the heavily loaded logging trucks were tearing up the roads made muddy by warm weather. In late January, 1969 plaintiff, anticipating the Forest Service shutdown, stopped the log cutters on the Slaughter sale and moved them to the Point of Rocks sale and Lower Baney sale.

The Point of Rocks sale was at a flat rate without an escalation provision and contained about two million board feet of timber at $7.20 per M.B.F. Prior to January, 1969 plaintiff held the Houghton sale (2,200,000 board feet) at a tentative rate of $9.75 per M.B.F. This sale was to expire December 31, 1968 and plaintiff had not cut the timber " * * * due to a lack of working capital and this deal with Duke City was so late being all put together and money did not come in time for me to start operating on it in 1968 and consequently, it required an extension on it." The Forest Service granted an extension through June 30, 1969 with the tentative rate increased to approximately $26.95 per M.B.F. in February, 1969 (with cutting and hauling, approximately $50.00 per M.B.F.). Plaintiff had other sales, some with an escalation rate clause and some at a flat rate.

Duke City told plaintiff that it would not pay any stumpage payments except on the Houghton sale because he would have to pay for it whether he cut it or not. Plaintiff then moved the logging operation to the Houghton sale and completed the sale by the last of June, 1969.

The following is a list of sales held by plaintiff and their distance from his sawmill in Magdalena.

Lower Baney, fifty to sixty miles; Durfee Unit, twenty-five miles; Point of Rocks, thirty-five miles; North Canyon, thirty to thirty-five miles; Slaughter, ninety miles; Houghton, ninety miles.

Plaintiff stated it would cost $10.00 more per M.B.F. to haul from Houghton than it would Point of Rocks.

After September, 1969 plaintiff held four sale contracts with the Forest Service amounting to six and one-half or seven million board feet.

### Market Conditions—October 1968 to September 1969

The Random Lengths publication is a weekly report on lumber prices and marketing. It is recognized as a good source of the information of the lumber market in the West Coast area. From that publication Duke City prepared a graph purporting to show market conditions in New Mexico. To benefit the reader the following index is shown only for the purpose of showing the reported dollar market trend as reported by Random Lengths during this period of time.

To show this market trend a 1 x 12 board of number three, four and five grades, dried ponderosa pine, will be used. Dollar amounts are per M.B.F. The following index does not attempt to portray all grades and sizes of lumber.

| DATE | GRADE #3 | #4 | #5 |
|------|---------|-----|-----|
| October 11, 1968 | $100 | $ 89 | $ 45 |
| November 15, 1968 | 109 | 99 | 50 |
| December 13, 1968 | 125 | 115 | 55 |
| January 10, 1969 | 132 | 122 | 58 |
| February 7 | 148 | 130 | 64 |
| March 7 | 170 | 137 | 72 |
| April 4 | 173 | 129 | 70 |
| April 11 | 160 | 122 | 65 |
| April 18 | 154 | 112 | 65 |
| April 25 | 131 | 93 | 60 |
| May 2 | 130 | 92 | 58 |
| May 9 | 122 | 85 | 55 |
| May 16 | 110 | 78 | 54 |
| May 23 | 106 | 76 | 52 |
| May 29 | 96 | 70 | 52 |
| June 6 | 90 | 68 | 50 |
| June 13 | 86 | 65 | 49 |
| June 20 | 80 | 62 | 48 |
| June 27 | 80 | 65 | 48 |
| July 3 | 81 | 66 | 48 |
| July 25 | 80 | 66 | 48 |
| August 15 | 78 | 65 | 48 |

In commenting on a graph similar to the above, a witness who was in the New Mexico lumber business stated: " * * * [W]e did not have the decline of these products which they show, pricewise, during this particular period of time. Other items which were produced in this part of the country or in the lumber industry definitely did not decline like that." During the period of time from April, 1969

through September, 1969, "[t]here was a certain amount of buying resistance; however, they were still building a volume of houses, apartment houses, and what-have-you; they were buying lumber. The price was not what it had been, but the material was still moving. We had no problems." Plaintiff stated that although there was a price decline between March and June 19, 1968 "* * * it was still the best price I had ever seen still in June [1969]." He also stated the lumber in inventory was still marketable and that a reasonable time to move the lumber would have been "* * * a day or two after it was ready to ship."

### Log Scaling and Overrun

Log scaling is the measurement of a log using a calibrated scale rule to determine the amount of board feet of lumber. Overrun is the extra amount of board feet received from a log which has been scaled. This is a built-in factor in the scaling and is dependent on the first cut, kerf (sawdust) taken from the log in the process of cutting it into lumber, uniformity of sawing, log damage, amount of taper of the log and imperfections in the log.

Plaintiff stated that, as to overrun in the several years leading up to 1967, "[t]en percent [was] the factor [he had] always used and found to be conservative" with regard to ponderosa pine, his principal source of logs.

Plaintiff's accountant testified that Duke City shorted plaintiff on all rough green lumber shipped, by paying only according to the Forest Service scale and not adding overrun. Duke City contended that the Forest Service had overscaled by twenty percent, thus wiping out the built-in overrun. Plaintiff and the Forest Service checked and discovered only slight overscaling which was subsequently adjusted by the Forest Service.

### Grading

"Grading" is determining the quality of lumber produced. Duke City sent a grader to plaintiff's mill in February, pursuant to the October 16th contract, to help plaintiff with his operation. Plaintiff was to pay a portion of his wages and Duke City the balance.

During this time plaintiff noticed "[he] had more common grade lumber in [his] upper grade lumber than [he] had previously had." After the man had been on the premises for about a week plaintiff told Duke City he did not want him as a grader. The man remained on the premises but no longer performed services for plaintiff as a grader.

Under the October contract the grading was to be done according to the procedures established by the Western Wood Products Association. Under these rules when lumber is downgraded (to a lower quality) by a buyer, a reinspection is available to the seller from the Association within ten days from unloading. The lumber is to be kept intact for no longer than thirty days after the complaint.

Duke City informed plaintiff by way of a corrected invoice that a regrading had been done on one of his shipments and the lumber was found to be forty to fifty percent off grade. Plaintiff was told to be at Duke City's Albuquerque yard the next day for a reinspection. When plaintiff arrived he found no one. Plaintiff did not receive the ten day notice nor was the lumber kept intact for thirty days as required by the rules.

### Work Slowdown

Plaintiff and various of his employees testified that Duke City's employees, on plaintiff's premises at Duke City's request, were intentionally slowing down the production efforts of plaintiff. There was also testimony that Duke City restricted the use of working capital by requiring plaintiff to stall equipment payments and essential equipment repairs. Duke City also slowed down plaintiff's production by forcing him to rework his planer and drying yard, and shortly thereafter requiring him to ship all lumber in the green state directly to Duke City. Duke City further slowed plaintiff down by not sell-

ing the large inventory of planed lumber stacked in plaintiff's yard though buyers were available (see Working Capital, supra).

Finally, Duke City kept demanding more of plaintiff's time away from the sawmill. It gradually became almost "a daily occurrence."

*Supplemental Contract Background*

By June, 1969 because of the large inventory that Duke City would not ship out, plaintiff was broke (see "Working Capital", supra). At this time fifty percent of the proceeds was being credited to the original note and fifty percent was being credited to the advance account.

On June 11, 1969 Duke City informed plaintiff that it wanted him to ship his total production, in green form, to them. This action would shut down plaintiff's planer and drying yard. Plaintiff stated it would reduce his profit-making ability tremendously, as the real profit margin was in surfaced lumber. Liberman gave plaintiff a copy of this agreement when plaintiff " * * * was not in any state of mind to discuss business * * * ", as he was leaving for California for his father-in-law's funeral. Plaintiff then asked Duke City if they would cover the payroll and contract logger payment, totalling approximately $23,000.00, so plaintiff could sign the checks before he left on the trip. Plaintiff was told not to worry about a thing and that the deposit would be made and they would discuss the Supplemental Agreement on his return. Up to this time Duke City had been trying to get plaintiff to ship his total production in a green condition and plaintiff had always told Duke City "hell no."

Plaintiff returned four days later and went to Albuquerque at the request of Duke City. Plaintiff described the meeting at Duke City's office as follows:

" * * * At this point they began to discuss me bringing in, sending in my rough green total mill output in the rough green state. Again I told them

there was no way. This went on for possibly an hour or a certain length of time. Anyway, I would estimate an hour and a half, just discussing it back and forth. Ira Liberman hit his desk and pointed at me and said, 'I'm not asking you, I'm telling you. You are going to sign this or you're in trouble.' My response was, 'What the hell do you mean, I'm in trouble,' and he said, 'You're overdrawn at the bank and you're not going to get another penny until you sign this agreement.' And I said, 'What do you mean I'm overdrawn at the bank?' And he said, 'You put out payroll in the amount of twenty some thousand dollars and I didn't cover it and I am not going to. You are not going to get another penny until you sign this agreement.' And I told him to go to hell and took my wife and walked out.

"Q. Now, up to this point, Mr. Terrel, had you known that the $23,000 had not been deposited to your account as Mr. Liberman told you it would be?

"A. No, I had no idea. It was just kind of like getting hit in the face.

"Q. What did you do when you walked out?

"A. We got outside and into the anteroom, and my wife said, 'Bill, you can't do that.' And I said, 'The hell I can't. You just heard me do it.' And she said, 'Yeah, you just stop and think. This isn't your money your gambling with. There is no way in the world that you can cover these checks.'

" * * *

"A. She pointed out that I could not refuse to sign this because it would break other people, or might break, it at least would hurt other people. And I had no right to gamble in any way with other people's money. That I had written checks and issued checks and I had no way to pick them up. The only way I made money was by selling lumber,

and I couldn't sell any lumber under the terms of this October 16th agreement. And I agreed with her that she was right, so I went back in and told Duke City personnel that was in there that I would sign the agreement.

"Q. On what basis, I mean what would they have to do for you to sign the agreement?

"A. At the time, that's all I said. I said, I'll sign it. I don't feel like signing it now. Ira said fine, I'll check it over and I'll bring it to Magdalena and you sign it there. And I left.

"Q. Now, Mr. Terrel, what was it that made you say you would sign the agreement. Why did you say you would sign the agreement?

"A. The fact that I had hot checks out and no way to cover them. I realized that it would probably break my logger. It would break the person that we knew cashed most of my payroll checks. And I knew it would—to say the least it would put him in a real bad position. And I just felt like it was my loss and not theirs, or this is the way I felt it should have been. So, due to these reasons, I felt like I had to sign it."

After June 24, 1969 whenever payments were made by Duke City on behalf of plaintiff they were marked "Little Tree new sawmill." Little Tree (plaintiff) did not have a new mill nor did Duke City.

*The Supplemental Contracts*

The first and second supplemental agreements were both signed on June 19, 1969 and were as follows:

"FIRST SUPPLEMENTAL AGREEMENT

" * * *

"1. [Definitions]

"2. All of Terrel's surfaced inventory and inventory in the process of drying or re-manufacturing, as of the date of this First Supplemental Agreement will be handled in accordance with Paragraph 3 of the Original Agreement until all inventory on hand is exhausted.

"3. Except as it applies to inventory on hand, Paragraph 3 of the Original Agreement is hereby amended for the term of this First Supplemental Agreement as follows:

"a. Terrel will deliver to Duke all of Terrel's production in the rough green condition. All Ponderosa Pine shop and better shall be handled pursuant to Paragraph 2 of the Original Agreement and all other lumber shall be priced according to the following formula:

"(i) Duke will take periodic sample volumes of Terrel's lumber and determine therefrom an average board foot per layer by grade, width and thickness for each separation which Terrel makes by width and thickness.

"(ii) Duke will pay for lumber received weekly at Duke's Albuquerque plant on the basis of prices stated in *Random Lengths* for the Thursday following the week of delivery. Prices will be those shown in *Random Lengths* for proper and applicable species, width, thickness and grade less 5% wholesale discount. In the event *Random Lengths* gives two prices, the price in parentheses will control for the item.

"(iii) The price, as determined from *Random Lengths*, will be adjusted by deducting the following items: (1) $6.79 per MBF for freight, (2) $17.00 per MBF for drying, surfacing and shipping costs, (3) 2% cash discount. The $6.79 per MBF freight adjustment will not be made for timber sawmilled from the Lyon and Beaver Head sales.

"b. Terrel will receive $15.00 per MBF for each weekly shipment of lumber

priced according to the foregoing formula, and the remainder of the price derived from the formula will be applied to the outstanding balance due Duke on the obligations until the obligations are fully paid off.

"Terrel shall within three (3) days of receipt of any payment from Duke notify Duke in writing of any objection thereto. Failure to so object shall permanently waive any and all objections including objections to Duke's determination of volume, species, grade, width, thickness and price.

"c. Prices will be F.O.B. trucks, Magdalena, on all transactions.

"4. It is understood that by accepting shipments of lumber in the rough green condition in accordance with this First Supplemental Agreement Duke is not thereby waiving any default or any right or remedy granted by existing agreements, notes, or security agreements between the parties. Duke, at its sole option, may elect to terminate this First Supplemental Agreement and to require delivery of all lumber in accordance with the Original Agreement. Unless earlier terminated by Duke this First Supplemental Agreement shall remain in effect for so long as the obligations remain unpaid in whole or in part.

"5. All provisions and conditions contained in the Original Agreement above referred to shall be and remain in full force and effect except as hereby supplemented and amended."

"SECOND SUPPLEMENTAL AGREEMENT

" * * *

"1. Paragraph 3 of the original Agreement dated October 16, 1968, as amended by the First Supplemental Agreement dated the 19 day of June 1969, is hereby amended as follows:

"A. All of Terrel's surfaced inventory and inventory in the process of drying or remanufacturing, as of the date of the First Supplemental Agreement, will be finished by Terrel and will immediately be shipped to Duke's Albuquerque plant for storage.

"B. Duke will protect the said lumber the same as it protects its own lumber.

"C. The price to be paid Terrel for said lumber shall be the prevailing wholesale market price at the time orders are placed with Duke by Duke's customers, less 5% wholesale commission and 2% cash discount ten days from the date of invoice.

"Prices will be F.O.B. trucks, Magdalena, on all transactions.

"D. Terrel agrees to protect Duke from any and all claims or objections to volume, grade, tally or quality of lumber shipped to Duke's customers in accordance with W.W.P.A. rules and regulations.

"2. In the event that Duke shall elect to terminate the First Supplemental Agreement and to require performance by Terrel in accordance with the original Agreement, Duke shall have the sole option to elect whether to store the finished lumber in Albuquerque or at Terrel's mill in Magdalena, New Mexico.

"3. All provisions and conditions contained in the original Agreement and the First Supplemental Agreement shall be and remain in full force and effect except as hereby supplemented."

*Costs of Production*

Plaintiff stated his cost of planing was $6.00 per M.B.F. as opposed to the $17.00 charged to him in the Supplemental Agreement. Also, surfacing was plaintiff's most profitable operation. Finally, approximately seventy to seventy-five percent of plaintiff's production was in the common and dimension lumber and by the loss of the opportunity to surface this lumber plaintiff " * * * lost all chance of making any money."

## Inventory

By May, 1969 plaintiff had a large inventory of planed lumber but Duke City was not moving it. By June, 1969 plaintiff was broke because the large inventory was not being moved by Duke City even though there were lumber brokers wanting to buy.

Plaintiff stated that the lack of movement of the lumber put him "* * * in a position where every penny [he] received was in the form of an advance, or loan. I had no money. I could not control any of my expenses. I lost all control. I could not manage my business in any respect." Also plaintiff stated: "I could not [make any equipment payments]. I could not make my utility payments. I could not make my tax payments. I couldn't make any payments. I made the net operating expenses, and that was all. Had I been able to move this lumber and receive the proper price for it, I would have been making a profit."

On June 21, 1969, two days after the signing of the Supplemental Agreements, Duke City sent a contract trucker with "* * * a total of eighteen or nineteen trucks and two or three of them made two trips * * *" to remove the inventory of surfaced lumber. Plaintiff was told the reason for moving it was so that Duke City could "protect it." The trucks hauled both surfaced and rough green lumber. He stated: "* * * We actually hauled some of the lumber that day that came off the chain, the rough green. * * *" After June 21, 1969 Duke City took the lumber "as fast as it was produced."

## Control of Working Capital

Duke City did not restrict the use of working capital funds up until February, 1969 except to require them to be used to pay working capital expenses. Beginning in May, 1969, however, Duke City began substantively restricting the use of working capital. During that time Duke City postponed authorization for fork-lift repair, an expense Terrel felt was essential to the operation of his mill. Duke City also required Terrel to put off the payment of contractors and taxes. After June 19, 1969 Duke City required plaintiff to submit a list of all payees and amounts to be paid. Duke City would select from the list what checks were to be written and then it would make the deposit in plaintiff's account with directions to the bank to only honor specified checks.

Duke City set September 6, 1969 as the cut-off date for further advances, but agreed to cover the checks of the preceding week. Plaintiff, in accordance with that agreement, submitted a list of $1,700.-00 or $1,800.00 worth of checks which Duke City did not pay. Plaintiff was left overdrawn at the bank on September 6, 1969 in the amount of these checks.

## Value of Business

Plaintiff stated that on September 6, 1969 he had rolling stock (trucks, trailers, tractors, bulldozers, etc.) valued at approximately $300,000.00 with an indebtedness of $70,000.00 to $80,000.00 on the first mortgage. Subsequently, the equipment was repossessed by various lenders and equipment dealers.

One witness stated that the business was worth $400,000.00 as a going operation but if the sawmill had to be liquidated it would be worth $75,000.00 to $80,000.00.

Another witness stated he had approached plaintiff in March or April of 1969 with the view of buying fifty-one percent of plaintiff's mill. He liked the quality of the timber and lumber sawed. He stated: "We were negotiating for $300,000 for a fifty-one percent interest * * *" and that "[a]t the time the price of $300,000 was established on my first visit, and my interest was adequate, and my opinion as to the evaluation of the entire operation was sufficient to encourage me to come back on three more occasions to further investigate to determine whether or not I would be willing to g[o] ahead with that type of purchase." The last trip by the witness to plaintiff's sawmill was in July, 1969.

Plaintiff testified that after closing down in September, 1969 he attempted to

reopen but Duke City closed him down and that except for salvage value his business was worthless.

### Duke City and Liberman's Testimony and Exhibits

In a word, the defense testimony was almost diametrically opposed to that of plaintiff's or was of such a nature to be in opposition to plaintiff's claims. Those parts of the testimony relevant to this appeal will be referred to only in the discussion of the issues on appeal.

### Relevant Motions

On defendants' motion the trial court severed the third-party claim for a separate trial.

At the close of plaintiff's case defendants moved for a directed verdict on the claims of economic compulsion, fraud, breach of contract and conversion. The trial court granted the motion on conversion; granted the motion on fraud as to defendants Joe and Jack Grevey; denied the motion on breach of contract but limited its submission to the jury to certain specific items; and denied the motion as to the claim of economic compulsion by Duke City, no claims having been made against the individual defendants.

At the close of defendants' case, defendants' motion for directed verdict was denied on the remaining claims.

### Relevant Instructions to the Jury

"INSTRUCTION NO. 2

"The breach of contract claim applies only to Duke City Lumber Company. Plaintiff contends that Duke City breached the contract of October 16, 1968, (and hereafter in these instructions when I refer to 'contract', I mean the contract of October 16, 1968). That the breaches of contract and the damages to Plaintiff resulting from each breach are:

"(A) Between October 16, 1968, and September 8, 1969, Duke City failed to place orders for Terrel's surfaced common grade lumber within a reasonable time, to

Terrel's damage in the amount of $14,000.-00. This claim asserts a breach of Paragraph 3 of the contract.

"(B) Between October 16, 1968, and September 8, 1969, Duke City downgraded Terrel's surfaced common grade lumber to Terrel's damage in the amount of $3,100.-00. This claim asserts a breach of Paragraph 10 of the contract.

"Plaintiff has the burden of proving these claimed breaches of the contract and the damages from the claimed breaches of the contract.

"Duke City denies each of the claimed breaches of contract, and denies the damages asserted by Plaintiff in connection with the claimed breaches of the contract.

"Duke City as affirmative defenses to the breach of contract claims, asserts that if it did breach the contract any breach on its part is excused by Terrel's prior or concurrent breach, or that any such breach has been waived by Terrel.

"Duke City has the burden of proving its affirmative defenses.

"If you find that Plaintiff has proved one or more of the claimed breaches of contract, and has proved damages in connection with any such breach, and if you find that Duke City has not proved any one of its affirmative defenses, then your verdict should be for the Plaintiff as to any breach of contract proved.

"If, on the other hand, you find that none of the claimed breaches of contract have been proved, or that damages have not been proved in connection with any breach you find to have occurred, or that Duke City has proved any one of its affirmative defenses, then your verdict should be for Duke City on the breach of contract claim.

" * * *

"INSTRUCTION NO. 11

"Plaintiff's second claim concerns economic compulsion. Economic compulsion means involuntary action in which one is compelled to act against his will in such a manner that he suffers a business loss.

Pursuant to this definition, economic compulsion means intentional conduct by one person which not only tends to overcome the will of another person, but actually accomplishes this result. Thus, for there to be economic compulsion, there must be an actual deprival of freedom to choose.

"INSTRUCTION NO. 12

"Economic compulsion may be accomplished by conduct or by threats of conduct by one which compels another to act against his will. Since economic compulsion involves compelled action, it may not be accomplished if at the time of the alleged economic compulsion a reasonable choice of action was available to the person claiming the economic compulsion, nor may economic compulsion be accomplished if the conduct or threats of conduct complained of is in the exercise of a right which the person had a legal right to do.

"INSTRUCTION NO. 13

"Plaintiff's claim of economic compulsion applies only to Duke City Lumber Company. The claim is that as a result of economic compulsion on the part of Duke City, Terrel

"(a) Performed unnecessary repair work on his planing mill;

"(b) Unnecessarily reworked his drying yard;

"(c) Cut the timber on the Houghton, or Beaverhead, Timber Sale;

"(d) Bid on the Lyon Timber Sale;

"(e) Executed the First and Second Supplemental Agreements to the contract.

"Plaintiff claims that he was damaged as a result of this economic compulsion as follows:

"(a) Planer repair and drying yard work in the amount of $1,127.50;

"(b) Extra cost in processing Houghton in the amount of $112,607.00;

"(c) Inability to process other timber sales while processing Houghton, $63,000.00;

"(d) The amount paid for the Lyon Timber Sale, $13,100.00;

"(e) Overcharged planing cost under the Supplemental Agreements, $10,460.-00;

"(f) Loss of saw mill and planing mill in the amount of $600,000.00;

"(g) Loss of rolling stock, $68,538.00.

"Plaintiff has the burden of proving the claimed economic compulsion and any damages resulting therefrom.

"Duke City denies that Terrel took any action as a result of economic compulsion on its part, and denies that Terrel suffered any damage from economic compulsion. In addition, Duke City affirmatively asserts:

"(a) Terrel became insolvent after execution of the contract, and actions by Duke City were taken in connection with this insolvency.

"(b) If there has been any economic compulsion by Duke City, Terrel waived any right to claim damages for it, and ratified the alleged economic compulsion by Duke City. Duke City has the burden of proving its affirmative defenses.

"If you find that Plaintiff has proved one or more of his claims of economic compulsion, and has proved damages in connection with such claim, and if you find that Duke City has not proved its affirmative defenses, then your verdict should be for the Plaintiff as to any economic compulsion proved.

"If, on the other hand, none of the claims of economic compulsion have been proved, or that damages have not been proved in connection with any economic compulsion that you find to have occurred, or that Duke City has proved any one of its affirmative defenses, then your verdict should be for Duke City on the economic compulsion.

"INSTRUCTION NO. 14

"The general rule concerning 'burden of proof' which I have stated to you in con-

nection with the breach of contract claim does not apply to the economic compulsion claim.

"To establish economic compulsion proof must be clear and convincing. It must be more than a preponderance of the evidence. Plaintiff will not have met the required burden of proof for any one or more claims of economic compulsion that are not established by clear and convincing evidence.

"Evidence is clear and convincing as to an economic compulsion claim if you have an abiding conviction that such a claim is true. Evidence is not clear and convincing if you find the evidence to be evenly balanced, or barely in favor of Plaintiff, or if the evidence leaves a question in your mind as to the alleged economic compulsion.

"The requirement of clear and convincing evidence to establish economic compulsion does not apply to the affirmative defenses of Duke City. As to those affirmative defenses the general rule applies. Thus, for Duke City to establish an affirmative defense to an economic compulsion claim, it must prove that defense by preponderance of the evidence.

"INSTRUCTION NO. 15

"Plaintiff has two distinct theories of economic compulsion. First: He contends that Duke City promised to provide him with working capital; that in reliance on this promise, Terrel did not seek to obtain working capital from outside sources; that Duke City did, in fact, provide him with working capital, and then by use of threats to refuse to provide him with further working capital, it forced Terrel against his will to perform the repair work on the planing mill and the drying yard; to cut the timber on the Houghton Timber Sale, and to bid on the Lyon Sale. Damage claims (a), (b), (c), (d), (f) and (g) of Instruction 13 are based on this theory.

"Second: He contends that Duke City promised to cover payroll and logger expense in June, 1969; that he issued checks

in reliance on this promise, and that Duke City failed to make the deposit to cover these checks. He contends that this failure on the part of Duke City forced Terrel, against his will, to enter the Supplemental Agreements to the contract. Damage claims (e), (f) and (g) of Instruction 13 are based on this theory.

"INSTRUCTION NO. 16

"Duke City's theory is that no economic compulsion occurred. It contends that Terrel was insolvent at the time of executing the contract; that Duke City executed the contract upon Terrel's assurance that he would obtain working capital; that upon Terrel's failure to obtain working capital, Duke City loaned Terrel money on the basis of Terrel's log and lumber inventory; that Terrel was delinquent in repaying the loans; that due to escalation in stumpage costs, mis-scaling of the logs by the Forest Service, market conditions and Terrel's mismanagement, Duke City's security for the loans was endangered; that Duke City sought and obtained execution of the Supplemental Agreements to protect its security, and as an alternative to foreclosing against Terrel at the time of the execution of the Supplemental Agreements.

"INSTRUCTION NO. 17

"Two of the issues involved in the economic compulsion claim have previously been defined in these instructions. They are insolvency and waiver. An issue under this claim is that of ratification. A person may ratify an agreement. Ratification occurs if, knowing the terms and conditions of the agreement the person acts pursuant to the agreement, and accepts the benefits of the agreement for a considerable length of time after he has had the opportunity to avoid or repudiate.

"INSTRUCTION NO. 18

"You may award damages for any one or more economic compulsion claims which have been proven. The amount of any damages must have been proximately

caused by the proven economic compulsion claim claims.

"The 'proximate cause' of damages is that which in a natural and continuous sequence produces the damages, and without which the damages would not have occurred. It need not be the only cause, nor the last or nearest cause. It is sufficient if it occurs with some other cause acting at the same time, which in combination with it, does in fact cause the damages."

### Jury Interrogatories and Verdict

The jury found by interrogatory that Duke City breached the October 16, 1968 contract and found for plaintiff under instruction No. 2 pursuant to claim (a) in the amount of $14,000.00 and pursuant to claim (b) in the amount of $3,100.00.

It also found Duke City liable for economic compulsion in the following amounts:

```
"CLAIM (a)—(Planer    repair    and
              drying yard work)    $   1,127.50
"CLAIM (b)—(Extra cost in proc-
              essing Houghton timber
              sale)                 $112,607.00
"CLAIM (c)—(Inability [t]o process
              other timber sales while
              processing Houghton)  $ 63,000.00
"CLAIM (d)—(The amount paid for
              the Lyon timber sale) $   –0–
"CLAIM (e)—(Overcharged    planing
              costs under the Supple-
              mental Agreements)    $ 10,460.00
"CLAIM (f)—(Loss of saw mill and
              planing mill)          $367,000.00
"CLAIM (g)—(Loss of rolling stock) $ 64,164.00"
```

The jury by its special interrogatories found that neither Duke City nor Liberman defrauded plaintiff or acted maliciously as to plaintiff or with a reckless disregard for plaintiff's rights.

The jury then returned a verdict for plaintiff against Duke City and awarded damages in the amount of $635,458.50.

### Post Trial Motions and Rulings

Subsequently Duke City filed alternative motions for Judgment N.O.V., New Trial and Remittitur.

The trial court denied the motion for a Remittitur and New Trial, and denied Duke City's motion for Judgment Notwith-

standing the Verdict " * * * except as to that part off [sic] the motion which dealt with the items of damages found by the jury in Claims B and C of Special Interrogatory No. 2 * * *" and as to those two claims set aside the verdict of the jury in the amount of $175,607.00.

### Judgment on the Verdict

The trial court then entered judgment on the verdict as follows:

" * * *

"1. IT IS HEREBY ORDERED, ADJUDGED AND DECREED that ·Plaintiff do have and recover from the Defendant Duke City Lumber Company the sum of $459,851.50 reduced and offset by $344,174.19, the amount of the summary judgment heretofore entered in favor of the Defendant Duke City Lumber Company, which summary judgment, thus having been offset, is hereby fully paid and satisfied, and that a net and final judgment thus be, and hereby is, awarded to the Plaintiff against the Defendant Duke City Lumber Company in the sum of $115,677.31, plus costs assessed in favor of the Plaintiff against Defendant Duke City Lumber Company plus interest at the rate of six per cent (6%) per annum from the date of entry hereof until paid in full.

"2. IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Plaintiff take nothing by their complaint in this cause against Defendants Ira Liberman, Jack Grevey or Joe Grevey and that judgment be, and hereby is, entered in favor of said Defendants and against Plaintiff, together with costs assessed in favor of these Defendants against the Plaintiff."

DISCUSSION:

Defendant's first point for reversal is:

"THE ECONOMIC COMPULSION DAMAGE CLAIM FOR $367,000.00 'LOSS OF SAWMILL AND PLANING MILL' WAS ERRONEOUSLY SUBMITTED TO THE JURY, AND THE COURT ERRED IN DENYING

DUKE CITY'S MOTIONS FOR DIRECTED VERDICT AND FOR JUDGMENT NOTWITHSTANDING VERDICT CONCERNING SUCH DAMAGE CLAIM, FOR THE FOLLOWING REASONS:

"A. AS A MATTER OF LAW, CONSEQUENTIAL DAMAGES MAY NOT BE RECOVERED FOR ECONOMIC COMPULSION.

"B. THE CLAIMED DAMAGE WAS NOT PROVEN TO BE THE PROXIMATE RESULT OF ANY WRONGFUL CONDUCT OF DUKE CITY.

"C. THE AMOUNT OF THE CLAIMED DAMAGE WAS NOT PROVEN WITH REQUIRED CERTAINTY.

"D. THE AWARD WAS FOR LOSS OF SAWMILL AND PLANING MILL AND TERREL, IN FACT, HAS NOT LOST HIS SAWMILL OR PLANING MILL."

A. Consequential damages for economic compulsion.

■ It is defendant's position that the trial court misconstrued the effect of Pecos Const. Co., Inc. v. Mortgage Invest. Co. of El Paso, 80 N.M. 680, 459 P.2d 842 (1969). According to defendant *Pecos* held that consequential damages may not be recovered for economic compulsion and that recovery is limited to avoidance of the obligation or return of the money or property transferred. We do not so read *Pecos*.

In *Pecos,* defendant contracted with plaintiff to furnish financing for a housing project and obtained FHA approval as required. After plaintiff had spent funds in planning the project defendant refused to perform unless it was paid an additional sum. Plaintiff paid the sum and filed suit, contending the payment was made under duress amounting to business compulsion.

Our Supreme Court, in upholding the trial court's judgment for plaintiff, said: "* * * on breach of a contract to loan money, where special circumstances were known to both parties, as in the case before us, and from which it must have been apparent that special damages would be suffered from a failure to fulfill the obligation, such special damages may be recovered, provided such damages are not speculative or remote. 22 Am. Jur.2d Damages § 69, at 103; Price v. Van Lint, 46 N.M. 58, 120 P.2d 611 (1941), cited with approval in Bank of New Mexico v. Rice, 78 N.M. 170, 429 P.2d 368 (1967). The record does not reveal that the special damages awarded to Pecos Construction are speculative or remote."

■ Economic compulsion has gone by many different names—business coercion, business compulsion, business threats, business duress, economic coercion, economic threats, economic duress etc. See 45 Mich.L.Rev. 253 (1947) and cases cited therein. Courts and treatise writers have utilized a variety of approaches in attempting to analyze and rationalize the various cases. See 53 Iowa L.Rev. 892 (1968). The rationale of the doctrine is to discourage or prevent an individual in a stronger position, usually economic, from abusing that power by presenting an unreasonable choice of alternatives to another person in a weaker or more vulnerable position, in a bargain situation. That is to say the doctrine provides a cause of action so that an individual can protect his economic interests from the unreasonable exercise of power or advantage, usually economic, in a bargain situation.

■ Economic compulsion cases lend themselves most readily to the tort analytical framework (duty, breach of duty, causation and damages). We are inclined to this framework and so analyze *Pecos.*

### a. Duty

"* * * In general, a party has a superior bargaining position if he is the sole effective source of something need-

ed by the other party to avoid a severe economic loss, and the relationship is not reciprocal. The origin of the unequal bargaining power should be irrelevant. Once the superior bargaining position is established the party has a duty to use that position reasonably to assure the weaker party a reasonable choice of alternatives."

53 Iowa L.Rev., supra.

In *Pecos* the establishment of a superior bargaining position (control of funds) created the duty to offer the weaker party a reasonable choice of alternatives.

### b. Breach of Duty

The threat to withhold the funds from Pecos was a clear violation of the agreement under which Pecos proceeded. Under the tort theory it is " * * * the duty of the party in a superior bargaining position to refrain from economic threats if the threatened action could not be justified by * * * [an unreasonable] refusal to meet the contractual demand * * *" by the other party. In order to find a wrongful threat we must " * * * focus on the relationship between the threatened action and the contractual demand, and reduce the crucial determination to an analysis of commercial reasonableness. * * *" 53 Iowa L.Rev., supra. See Cadwell v. Higginbotham, 20 N.M. 482, 151 P. 315 (1915).

Under the foregoing *Pecos* readily sustains analysis. The lender's alternative was not reasonable; a bargain had already been struck. It would not have been practicable for Pecos to have done anything other than pay the additional price. To have done otherwise would have delayed the start of construction further, and reduced the time during which the commitment for the advancement of funds was in force.

### c. Causation

The general term "proximate cause" encompasses both causation in fact and proximate causation as a limitation placed on the tort-feasor's responsibility. Prosser on Torts, § 41 (4th Ed. 1971).

The latter type of causation occurs when the consequences " ' * * * were or should have been contemplated or might have been foreseen.' * * *" Valdez v. Gonzales, 50 N.M. 281, 176 P.2d 173 (1946).

For the former type of causation it is essential to show that the tortious action " * * * produce[d] the injury, and without which the injury would not have occurred. * * *" Thompson v. Anderman, 59 N.M. 400, 285 P.2d 507 (1955); Bank of New Mexico v. Rice, 78 N.M. 170, 429 P.2d 368 (1967); Kelly v. Montoya, 81 N.M. 591, 470 P.2d 563 (Ct.App.1970). As stated in 53 Iowa L.Rev., supra:

"The issue of causation in duress cases is complicated by the necessity for determining the victim's reason for accepting the contract. The criteria of adequate legal alternatives, gravity of the threatened injury, fairness of the resulting bargain, and ratification of the contract provide related but independent means to decide if the victim would have acquiesced in the absence of wrongful threats. * * * Recognition that causation is a central issue in the tort analysis places these tests in a proper perspective."

The *Pecos* court implicitly applied the "causation" factor in upholding the damages awarded in that case.

### d. Damages

Recovery under the tort theory is based on the wrongful conduct of the superior party and the victim is to be compensated for all actual damages which are suffered as a result of the failure to fulfill the obligation so long as the damages are not speculative or remote. *Pecos,* supra. Stated differently, in a claim of economic compulsion all damages suffered which were proximately caused by the economic compulsion are recoverable. This is consistent with the charge of the trial court in instruction No. 18 set forth under the heading "Instructions to the Jury."

424

As stated in Housing Authority of City of Dallas v. Hubbell, 325 S.W.2d 880 (Tex.Civ.App.1959):

"Duress is a tort. It often arises in connection with breach of contract, but it is nevertheless a tort, and it is not necessary that there should have been privity of contract between the parties as a prerequisite for such a tort action. One who sustains damage as a result of being subjected to duress may sue as plaintiff against the wrongdoer. 'Economic coercion', the basis of Lewis' cause of action, is generally considered a form of duress.

"In 52 Am.Jur. 380 it is said 'It is worthy of notice that a tort may involve acts which also constitute a breach of contract, and that the same facts will sustain either an action ex delicto or ex contractu, so that an action ex delicto will lie, notwithstanding the act complained of would also be ground for an action ex contractu. Under this rule, it has been held that accompanying every contract there is a common law duty to perform with care, skill, reasonable expedience, and faithfulness the thing agreed to be done, and the negligent failure to observe any of these conditions is a tort, as well as a breach of contract. Under such circumstances, the general rule is that the plaintiff may elect which to pursue.' "

The trial court's instruction set forth the standard for awarding damages under the tort theory. This was consistent with *Pecos*, supra.

█ Contract recovery in New Mexico is essentially the same. Allen v. Allen Title Company, 77 N.M. 796, 427 P.2d 673 (1967) and Brown v. Newton, 59 N.M. 274, 282 P.2d 1113 (1955). *Allen* in relying on *Brown* stated: " * * * the purpose of allowing damages in a breach of contract case is the restoration to the injured of what he has lost by the breach, and what he reasonably could have expected to gain if there had been no breach. (citations omitted)." Accord, Bank of New Mexico

v. Rice, supra, Price v. Van Lint, 46 N.M. 58, 120 P.2d 611 (1941). However, the consequential damages must be damages that were or should have been reasonably contemplated by the parties. Bank of New Mexico v. Rice, supra.

█ We think this policy of substantially merging the measure of damages in tort and contract cases is consistent with the modern trend of fully compensating a victim for his injury. The object of any rule for awarding damages is to afford just compensation for the injuries received. Rutherford v. James, 33 N.M. 440, 270 P. 794 (1928). Overruled on other grounds in Reed v. Styron, 69 N.M. 262, 365 P.2d 912 (1961).

Bettini v. City of Las Cruces, 82 N.M. 633, 485 P.2d 967 (1971) does not reach a contrary result. There, plaintiff *only* sought a return of funds paid. No claim for damages was made.

B. Proximate cause.

It is defendant's position under this heading " * * * that even if consequential damages are properly recoverable, Terrel failed to prove that the 'loss' of his sawmill was caused by any conduct of Duke City."

As proof of the above contention defendant asserts the following: Plaintiff's financial condition was so bad prior to the October 16, 1968 contract that he had to either get financing or sell the mill. The contract damages for unreasonable delay in placing orders and for illegal regrading occurred before the Supplemental Agreements and were not claimed under any theory as causing the loss of the sawmill and planing mill. The cost of the planer repair and drying yard rework consisted only of small payroll losses. The lumber market dropped significantly during the contract period, increasing the likelihood of an unprofitable operation. Finally, before signing the Supplemental Agreements Terrel's indebtedness to Duke City exceeded the inventory being used as security and he was delinquent in his payments. Duke City then had the right to declare a default and ac-

celerate payments. Damages awardable at that time would not have been enough to cure the delinquency, much less pay off the total indebtedness.

Two theories of economic compulsion were set forth in instruction No. 15. Under the first theory Duke City's threat to breach its promise to furnish working capital caused the damages as set out in instruction No. 13 under claims (a), (b), (c), (d), (f) and (g). Under the second theory Duke City's failure to make a promised deposit to cover the payroll and logger expenses in June, 1969 and forced Terrel to sign the Supplemental Agreements caused the damages set out in instruction No. 13 under claims (e), (f) and (g). Except for (d) the jury by special interrogatory No. 2 found for plaintiff. Under claims (f) and (g) (loss of sawmill and rolling stock) either theory would be applicable. Claim (a) relates only to the first theory and (e) relates only to the second theory.

For the purpose of this appeal (but not the cross-appeal) we assume the trial court was correct in granting defendant's motion for Judgment N.O.V. as to claims (b) and (c).

Defendant makes much of the argument that the combined contract and economic compulsion damages after the Judgment N.O.V., aside from the loss of the sawmill and rolling stock, totals only $28,587.50. Defendant would have us believe plaintiff's argument is to the effect that this damage caused plaintiff to lose his business. Defendant concludes " * * * [t]his contention is preposterous in view of Terrel's admitted liability to Duke City for sums far in excess of any possible damage he claimed to have suffered. * * * "

Causation in this case was established by factors in addition to the awarded damages. The evidence showed that items of damage not formally prayed for nonetheless helped cause the loss (See "Grading," "Work Slowdown," "Costs of Production," supra). Terrel established that he was damaged by shortages under the Supplemental Agreements (See "Shortage Loss," supra). The trial court refused to submit those damages to the jury because the *amount* was speculative. Also, the existence of other causes, such as Terrel's prior financial state and the declining lumber market, does not exonerate Duke City when the evidence supports a conclusion that its actions concurrently caused Terrel's loss. See Ortega v. Texas-New Mexico Railway Company, 70 N.M. 58, 370 P. 2d 201 (1962); Kelly v. Montoya, supra.

■ In the instant case we believe the evidence set forth and the reasonable inferences that flow therefrom establish a pattern of consistent conduct on the part of Duke City directed towards the goal of financially ruining plaintiff and of subsequently acquiring his assets (e. g. Little Tree new sawmill). In viewing the evidence under the rules we have hereto set forth we hold that the evidence was clear and convincing in support of the claim and that as a matter of law we cannot say that the evidence did not instantly tilt the scales in the affirmative so that the jury's mind was left with an abiding conviction that the charges as to each element were true. Hockett v. Winks, supra; Lumpkins v. McPhee, supra.

Duke City would further have us hold that the jury was influenced by the Houghton damages (claims (b) and (c)) and since the trial court held these damages improper the consideration of the damage claims improperly influenced the jury. We cannot accept that position. The evidence here is so strong that the withdrawal of the Houghton claim, which largely related to damages, would not have affected the jury's judgment on proximate cause.

Finally Duke City asserts it " * * * could [not] have foreseen loss of the sawmill and planing mill * * * ", and therefore could not be charged with proximate causation of the loss. The evidence reviewed on appeal clearly and convincingly establishes that Duke City not only foresaw the loss, but worked diligently to produce it.

C. Proof of damage.

Under this sub-point Duke City contends "* * * there is no proof of damages in the amount of $367,000.00 for loss of the plaintiff's sawmill and planing mill. * * *" This sub-point really involves two arguments: (a) there is no proof of past profits necessary for an award for damage to Terrel's business; and (b) even if it is permissible to prove simply the "before and after" value of a business, the "after" value should not equal the salvage value.

a. Duke City asserts the rule of damages applicable here as set forth in De Palma & Ruppe v. Weinman & Barnett, 15 N.M. 68, 103 P. 782 (1909) is: "* * * proof of usual profits for a reasonable time anterior to the wrong complained of is necessary in order to recover damages. * * *" Duke City then states that since plaintiff had suffered an operating loss, as shown by his income tax returns, although certain financial statements showed a net profit, the damages were improper. Defendant then asserts that "[t]he measurement of damage to a business enterprise by lost profits, and denial of recovery when no past history of profits can be shown, is not a novel rule, but in fact is followed by a number of other jurisdictions. * * *"

The precise question before us has not been ruled on in New Mexico, that is: How are damages to a destroyed business enterprise measured?

De Palma, supra and J. R. Watkins Co. v. Eaker, 56 N.M. 385, 244 P.2d 540 (1952), relied on by Duke City in support of the rule it advocates, were actions for loss of profits and not for loss or destruction of a business.

The consideration of profits and losses is merely one method of computing damages arising from wrongful diminution of the value of a business. Elsbach v. Mulligan, 58 Cal.App.2d 354, 136 P.2d 651 (1943). As a general rule the damages for the loss or destruction of a going business are measured by its value at the time and place of destruction. Farmers Insurance

Exchange v. Henderson, 82 Ariz. 335, 313 P.2d 404 (1957). This is nothing more than a "before" and "after" value rule and is partially consistent with that part of defendant's requested instruction No. 1 entitled "Statement of the Case" which states:

"(6) The loss in market value of [plaintiff's] mill and equipment. * * *"

We can conceive of situations where the "before" and "after" rule would be the only manner in which just compensation could be awarded. Where a business has been destroyed by fire, for example, lost profits would be an unjust damage measure. Similarly, with the destruction of a going business as in this case the "before" and "after" rule is the only method of awarding just compensation. Compare O'Meara v. Commercial Insurance Company, 71 N.M. 145, 376 P.2d 486 (1962); N. M. U.J.I. 14.14 (1966).

b. Defendant, in its second argument, assumes the correctness of the "before" and "after" value rule. It then argues that the "after" value would equal salvage value only if there was no timber available to the mill and the mill would therefore have to be moved to be operative. "* * * There is no evidence that the mill will be moved, and if there is evidence that no timber is available to the mill, the lack of availability of timber is not the fault of Duke City." Further, defendant asserts plaintiff himself admitted that timber was available for years to come.

Again, defendant's argument is irrelevant. "After" value equals salvage value in this case, not because of timber scarcity, but because plaintiff was financially unable to operate the mill. Since plaintiff was broke the mill value to him at that time was only the salvage value.

Additionally, defendant argues that Terrel predicated his scrap value of the mill on the fact it would have to be moved. That was not the whole of the testimony before the jury. The answer that the mill would be worth $75,000.00 to $80,000.00 was predicated on the assumption that the

usable parts of the mill would have to be moved or liquidated. To be liquidated the mill did not have to be moved.

■ Finally, defendant argues that the "before" value of the mill was based on "estimates or opinions." Owners and qualified experts are competent to give their opinion as to the value of property. City of Albuquerque v. Ackerman, 82 N.M. 360, 482 P.2d 63 (1971); Fitzgerald v. Fitzgerald, 70 N.M. 11, 369 P.2d 398 (1962). The evidence given here "* * * was not based upon mere surmise, guess, speculation or conjecture * * *" Fitzgerald v. Fitzgerald, supra, and the damage award of $367,000.00 was well within the range of testimony on the subject from $250,000.00 to $800,000.00.

D. Loss of Sawmill and Planing Mill.

Duke City argues here that plaintiff has not in fact lost the sawmill and planing mill. The answer to this follows from the answer to C(b) above. The "after" value of the mill was a salvage value, without capital to operate it or to purchase timber. There was evidence that plaintiff could not operate the sawmill and planing mill without capital. The jury by its verdict must have believed the testimony.

In conjunction with this argument on loss of sawmill and planing mill, Duke City filed a pre-submission motion in this court to remand to the trial court to reconsider the damage award. In conformance with the decision at the time, the opinion that resulted from that motion is attached hereto.

Defendant's second point for reversal is:

"THE TRIAL COURT ERRED IN SUBMITTING THE CLAIM FOR LOSS OF ROLLING STOCK UPON WHICH THE JURY AWARDED $64,164.00, AND IN DENYING DUKE CITY'S MOTIONS FOR DIRECTED VERDICT AND JUDGMENT NOT-WITHSTANDING VERDICT ON SUCH CLAIM, FOR THE FOLLOWING REASONS:

"A. CONSEQUENTIAL DAMAGES MAY NOT BE RECOVERED FOR ECONOMIC COMPULSION.

"B. THE DAMAGES WERE NOT PROVEN TO HAVE BEEN THE PROXIMATE RESULT OF ANY WRONGFUL CONDUCT OF DUKE CITY."

A. Consequential damages for economic compulsion.

This argument is·identical with and is disposed of under point A under defendant's first point. That the "Rolling Stock" element rather than the "Loss of Sawmill and Planing Mill" element is involved, does not change the analysis.

B. Proximate cause.

Again, this argument is identical with and is disposed of under point B of defendant's first point.

Defendant also states that "* * * [i]f the rolling stock had an equity value such as claimed by Terrel, his failure to make reasonable efforts to dispose of the equipment at its market value constitutes a failure to mitigate damages. * * *" Defendant's requested instruction on mitigation of damages was refused. We will assume a mitigation discussion is proper.

■ Defendant had a second mortgage on all of Terrel's rolling stock, but refers us to evidence that it released that second mortgage on one piece of equipment. Nonetheless there is not a showing that plaintiff in fact received any overage from the sale of the equipment or what the equipment was. There is no evidence that defendant would have released equipment on which there was an overage. Such evidence does not warrant an instruction on the duty to mitigate. A party is only entitled to have a jury instructed on correct legal theories which are supported by substantial evidence. La Barge v. Stewart, 84 N.M. 222, 501 P.2d 666 (Ct.App.1972).

Defendant's third point for reversal is:

"THE TRIAL COURT ERRED IN SUBMITTING THE ECONOMIC COMPULSION CLAIM CONCERN-

ING PLANER REPAIR AND DRYING YARD WORK AND IN DENYING DUKE CITY'S MOTIONS FOR DIRECTED VERDICT AND MOTIONS FOR JUDGMENT NOTWITHSTANDING VERDICT, NEW TRIAL, OR REMITTITUR, FOR THE FOLLOWING REASONS:

"A. TERREL FAILED TO ESTABLISH BY CLEAR AND CONVINCING EVIDENCE THAT THE PLANER REPAIR AND DRYING YARD WORK WERE CAUSED BY DUKE CITY'S ECONOMIC COMPULSION.

"B. THE CLAIM IS FOUNDED UPON AN ALLEGED ORAL AGREEMENT BY DUKE CITY TO PROVIDE WORKING CAPITAL: AS A MATTER OF LAW NO SUCH AGREEMENT COULD BE ESTABLISHED, FOR THE FOLLOWING REASONS:

"1. THE ORAL WORKING CAPITAL AGREEMENT WAS NOT ESTABLISHED BY CLEAR AND CONVINCING EVIDENCE;

"2. THE ORAL WORKING CAPITAL AGREEMENT VIOLATED THE STATUTE OF FRAUDS;

"3. EVEN IF PROVEN, THE ORAL WORKING CAPITAL AGREEMENT WAS TOO INDEFINITE TO ENFORCE;

"4. THE ORAL WORKING CAPITAL AGREEMENT VIOLATED THE PAROL EVIDENCE RULE."

A. Planer Repair and Drying Yard Work.

■ Under this point Duke City reviews the evidence, not with regard to the standard set forth herein but most favorably to itself. After so doing Duke City states there was no clear and convincing evidence that the planer repairs or drying yard rework were caused by economic compulsion practiced by Duke City upon the threat of cutting off working capital. The evidence set forth under "Planing Mill", "Drying Yard", and "Supplemental Agreements Background" is clear and convincing and supports the jury's verdict and award of damages.

B. Oral Agreement to Provide Working Capital.

1. Insufficient clear and convincing evidence.

■ The evidence under this point is set forth under "Working Capital." Duke City contends that the evidence was insufficient to clearly and convincingly establish an oral agreement to provide working capital. Plaintiff's first theory of economic compulsion in instruction No. 15 states in part:

"* * * [Plaintiff contends] that Duke City promised to provide him with working capital; that in reliance on this promise, Terrel did not seek to obtain working capital from outside sources; that Duke City did, in fact, provide him with working capital, and then by use of threats to refuse to provide him with further working capital, it forced Terrel against his will to perform the repair work on the planing mill and the drying yard; to cut the timber on the Houghton Timber Sale, and to bid on the Lyon Sale. Damage claims (a), (b), (c), (d), (f) and (g) of Instruction 13 are based on this theory."

To find for the plaintiff under this instruction, as they did, the jury had to find that the parties established a contract to provide working capital by their "course of conduct." There is evidence, as set forth above, that plaintiff was entitled to the giving of the instruction. We do not believe, as Duke City would have us believe, that the series of promissory notes evidenced a series of individual loans. This did nothing more than to present a factual issue for the jury to resolve. A review of the evidence supports the jury determination.

Duke City next contends that a working capital agreement cannot be supported on a "course of conduct" theory. It is Duke City's position that "* * * '[c]ourse of conduct' has not been used to require

the further loaning of money, or the performing of acts, simply because prior transactions may have been performed and one of the parties wants to enter an additional contract. * * * "

Although New Mexico has no cases dealing with the loaning of money it has followed the "course of conduct" rule. Gordon v. New Mexico Title Company, 77 N.M. 217, 421 P.2d 433 (1966) (setting forth the rule that "[u]nquestionably, custom or course of conduct may give rise to a contract implied in fact * * * "). Trujillo v. Chavez, 76 N.M. 703, 417 P.2d 893 (1966) (course of conduct to establish agreement as to status of passenger). Hillis v. Meister, 82 N.M. 474, 483 P.2d 1314 (Ct.App.1971) (course of conduct to establish obligation to follow rules and regulations relating to dismissal procedures even though not mentioned in teacher's contract).

We have neither been cited a case nor has our research disclosed one dealing with the furnishing of working capital. However, the fact that this case deals with a working capital loan does not change the logic of the "course of conduct" theory. See § 50A-1-205, N.M.S.A.1953 (Repl. Vol. 1962, pt. 1). The defendant's real objection is to the use of this theory to require contract renewal. But, as we said above, the jury found that there was one continuing contract, not separate loans. In our opinion the evidence supporting that finding was clear and convincing.

### 2. Statute of Frauds.

█ The Statute of Frauds is inapplicable here. The contract established by the "course of conduct" was for working capital loans and not the sale of goods. See Orman v. Hagar, 3 N.M. (Gild.) 568, 9 P. 363 (1886), Reinhart v. Rauscher Pierce Securities Corp., 83 N.M. 194, 490 P.2d 240 (Ct.App.1971). All lumber sold during that time was sold under the written contract of October 16, 1968. (See "Contracts", supra). The contract was also capable of being performed within one

year. Reinhart v. Rauscher Pierce Securities Corp., supra.

### 3. Indefiniteness of Working Capital Agreement.

█ The "course of conduct" of the parties established not only the existence of a contract, but the terms as well. Trujillo v. Chavez, supra; Hillis v. Meister, supra. The amount to be loaned was determined by the amount of working capital needed. The interest rate was shown on the promissory notes. The October agreement and later inventory appraisals established that inventory, machinery and rolling stock were to be security for the loan. Discussions between the parties indicate the contract would last as long as Terrel produced. The parties, by their conduct, "wrote" the contract. No more specificity is required. Compare Sanders v. Freeland, 64 N.M. 149, 325 P.2d 923 (1958).

### 4. Parol Evidence Rule.

█ The parol evidence rule is inapplicable here. The contract shown by the "course of conduct" was separate from the written contract of October 16th. (See "Working Capital", supra). Even assuming the two were connected, the modifying conduct took place after the signing of the written contract. The parol evidence rule " * * * applies only to oral agreements prior to or contemporaneous with the written agreement. * * * " Yucca Mining & Petrol. Co. v. Howard C. Phillips Oil Co., 69 N.M. 281, 365 P.2d 925 (1961).

Defendant's fourth point for reversal is:

"THE TRIAL COURT ERRED IN SUBMITTING BOTH ECONOMIC COMPULSION CLAIMS TO THE JURY, AND IN DENYING DUKE CITY'S MOTIONS FOR DIRECTED VERDICT AND MOTION FOR JUDGMENT NOTWITHSTANDING VERDICT, NEW TRIAL, OR REMITTITUR, FOR THE FOLLOWING REASONS:

"A. AS A MATTER OF LAW, TERREL HAD AN ADEQUATE

LEGAL REMEDY AND ACCORDINGLY, CANNOT CLAIM THAT HE ENTERED INTO THE SUPPLEMENTAL AGREEMENTS, OR PERFORMED THE PLANER REPAIR AND DRYING YARD WORK, UNDER ECONOMIC COMPULSION.

"B. AS A MATTER OF LAW, TERREL RATIFIED THE TRANSACTIONS ENTERED INTO OR ACTS PERFORMED ALLEGEDLY AS A RESULT OF ECONOMIC COMPULSION.

"C. AS A MATTER OF LAW, DUKE CITY CANNOT BE LIABLE BECAUSE TERREL ENTERED INTO TRANSACTIONS OR PERFORMED ACTS BECAUSE OF THE PRESSURE OF HIS OWN ADVERSE FINANCIAL CIRCUMSTANCES."

A. Adequate Legal Remedy.

█ In this argument Duke City first assumes that it threatened to breach the working capital agreement and the promise to cover the $23,000.00 in checks. It then contends that, under *Pecos*, supra, these threats are actionable as economic compulsion only if Terrel would not have had an adequate damage remedy to protect himself against the contract breach. Duke City concludes that Terrel had an adequate remedy.

Duke City's argument presupposes that plaintiff could obtain working capital funds from other sources. Such was not the case. As is shown under "Working Capital", supra, once Duke City established a course of conduct of supplying working capital plaintiff no longer sought to find outside working capital. Any attempt by plaintiff to enforce the working capital agreement through a remedy at law would have caused an immediate cessation of all of his activities. The urgency was such that there was no adequate remedy at law. The urgency was even greater in relation to the promise to cover the $23,000.00 in payroll and logger checks already issued.

The failure to immediately cover those checks would mean financial ruin or possible criminal liability. The inadequacies of legal remedies may arise from the delay necessary to invoke them—the choice remaining is only a choice of evils. *Pecos*, supra; *Cadwell*, supra.

B. Ratification.

█ Duke City asserts that Terrel ratified the planer repair and drying yard work which was done sometime in April or May of 1969 and "* * * Terrel continued to use both [planer and drying yard] up until the time of the supplemental agreements on June 19 and, in addition, he continued under the October 16 agreement, and later under the supplemental agreements, to ship lumber to Duke City and receive credit therefor and to borrow money from Duke City for working capital. * * *"

Whether Terrel continued to use the planer and drying yard is immaterial. Ratification is a contract doctrine, applicable when someone has been forced into a contract by duress. See Armijo v. Nuchols, 57 N.M. 30, 253 P.2d 317 (1953). As to the planer and drying yard repair Terrel was not forced into a contract but into tort damages. The jury verdict established that by doing the repairs he lost money. There were no benefits to retain but only losses to sustain. See Restatement, Contracts § 484 (1932).

Additionally, in order for the ratification to be binding "'* * * all undue influence [must be] * * * wholly removed so that [the party] can give a perfectly free consent. * * *'" Dunn v. Hite, 27 N.M. 53, 195 P. 1078 (1921), quoting 2 Pomeroy's Equity Jurisprudence § 964 (1918). Terrel could at no time have refused to do the repairs without the justifiable fear that Duke City would carry out its threat to stop the working capital advances.

As to the signing of the Supplemental Agreements, again it cannot be said that Terrel was "perfectly free." True, the original duress had ceased as soon as the

checks were paid. But, nonetheless, there remained the pervasive threat of working capital termination and the inability to cover the next payroll.

The jury was properly instructed as to ratification (see instruction No. 17, supra) and by its verdict necessarily determined the issue adversely to Duke City. We cannot say, as a matter of law, that ratification by plaintiff was established.

C. Plaintiff's Adverse Financial Condition.

Duke City asserts that:

"Granting Terrel the benefit of all the doubt, it must be concluded that he was 'threatened' by Duke City's statements that it would cut off working capital loans, or refuse to cover payroll and logging checks, simply because Terrel had no other money with which to make such payments or to continue operating his business. This is not a situation, such as that in *Pecos Construction, supra,* where performance by the Defendant is the only performance that will do the Plaintiff any good—in *Pecos* only the Defendant mortgage investment company had the FHA commitment necessary to begin the housing project. * * *"

This argument is irrelevant. Terrel admits his financial dependence on Duke City. The issue in this case is whether Duke City manipulated that dependence through economic compulsion to cause Terrel damage. The jury's finding in that regard is supported by clear and convincing evidence.

Even assuming defendant's analysis of *Pecos,* supra, is correct Duke City by its course of conduct placed plaintiff in the position of relying on it and in giving up seeking outside working capital funds. Thus, Terrel, like Pecos had only one reasonable alternative.

Defendant's fifth point for reversal is:

"EVEN IF THIS COURT SHOULD CONCLUDE THAT DUKE CITY IS NOT ENTITLED TO ENTRY OF JUDGMENT IN ITS FAVOR ON THE CLAIMS FOR LOSS OF SAW-MILL AND PLANING MILL AND LOSS OF ROLLING STOCK, DUKE CITY IS ENTITLED TO A NEW TRIAL FOR THE FOLLOWING REASONS:

"A. THE ERRORS OF THE TRIAL COURT DETAILED IN POINTS I THROUGH IV, SUPRA, IF DEEMED INSUFFICIENT TO REQUIRE ENTRY OF JUDGMENT IN DUKE CITY'S FAVOR ON THE DAMAGE AWARD CLAIMS IDENTIFIED THEREIN.

"B. THE TRIAL COURT ERRED IN REFUSING TO GIVE DEFENDANT'S REQUESTED INSTRUCTION CORRECTLY DEFINING CLEAR AND CONVINCING EVIDENCE.

"C. THE VERDICT IS SO EXTREMELY EXCESSIVE AS TO INDICATE THAT THE JURY WAS MISTAKEN IN THE MEASURE OF DAMAGES, OR ACTED FROM PASSION AND PREJUDICE, BIAS OR SYMPATHY."

A. New Trial.

Under this point Duke City asserts that even if it is not entitled to judgment in its favor on the claims of loss of sawmill and planing mill, the loss of rolling stock " * * * then certainly in that event the errors are sufficient to require a new trial * * *".

Since we have decided all issues adversely to Duke City there are no errors upon which to grant a new trial.

B. Duke City's Requested Instruction.

The third paragraph of instruction No. 14 states:

"Evidence is clear and convincing as to an economic compulsion claim if you have an abiding conviction that such a claim is true. Evidence is not clear and convincing if you find the evidence to be evenly balanced, or barely in favor of Plaintiff, or if the evidence leaves a

question in your mind as to the alleged economic compulsion."

*Hockett,* supra, stated the test of clear and convincing evidence as follows:

"* * * Evidence is clear and convincing in support of the essential elements of deceit *only if it instantly tilts the scales in the affirmative on each element, when weighed against the evidence in opposition,* and the fact finder's mind is left with an abiding conviction that the charges as to each element are true. * * *" (Emphasis Ours)

The trial court stated in its discussion of the instructions that it had "* * * deliberately omitted the description in the New Mexico cases concerning 'immediately tilting the scales to the affirmative,' thinking that that is an inappropriate visual example, however, I have chosen the word 'abiding conviction' because I do think that conveys the meaning to the term clear and convincing." Defendant objected to the omission of the "descriptive factor" because it "* * * is less than what was said there. [referring to *Lumpkins,* supra and *Visic,* supra]."

It is Duke City's position that the phrase "instantly tilt the scales in the affirmative" is as important as "abiding conviction" and that they mean different things. Duke City asserts this "* * * left out of the definition of clear and convincing evidence one of the most significant elements. * * *"

■ Assuming for the purpose of this opinion that "instantly tilting the scales in the affirmative" is an essential element on a point of law the issue was still not properly preserved for appeal. Rule 51(1)(i) [§ 21–1–1(51)(1)(i), N.M.S.A.1953 (Repl. Vol. 1970)] states that "* * * in case of a failure to instruct on any point of law, a correct instruction must be tendered. * * *" The record does not contain such a requested instruction. Panhandle Irrigation. Inc. v. Bates, 78 N.M. 706, 437 P.2d 705 (1968).

C. Excessive Verdict.

■ Duke City asserts that the size of the jury's verdict for loss of the sawmill and the planing mill—$367,000.00— "* * * either indicates that the entire verdict was the result of passion or prejudice or the verdict as to this item of damages is excessive in that it is not truly supported by the evidence and indicates that the jury was mistaken in the measure of damages, and accordingly Duke City is entitled either to a new trial on the issue of damages or a remittitur in the proper amount. * * *"

We disagree. The testimony of the value of the sawmill as a going operation ranged from $250,000.00 to $800,000.00. The value of $367,000.00 placed by the jury was certainly within the permissible range. Accordingly, we cannot say as a matter of law that the award was excessive.

Defendant's sixth point for reversal is:

"THE COURT ERRED IN DENYING DUKE CITY INTEREST AND ATTORNEYS' FEES ON ITS COUNTERCLAIM."

Under this point "* * * Duke City does not complain of this action as long as the judgment in favor of Terrel exceeds the judgment in favor of Duke City. * * *" Accordingly, our prior determination renders this point moot.

Defendant has advanced various other sub-arguments within its basic points. We have considered these sub-arguments and consider them to be without merit.

THE CROSS–APPEAL:

Plaintiff's first point of the cross-appeal is:

"THE TRIAL COURT ERRED IN GRANTING THE MOTION OF DEFENDANT DUKE CITY FOR JUDGMENT NOTWITHSTANDING THE VERDICT AS TO THAT PART OF THE VERDICT FOR DAMAGES FOUND BY THE JURY IN CLAIMS (b) AND (c) OF SPECIAL INTERROGATORY NO. 2 AND ERRED IN

ENTERING JUDGMENT UPON THE REDUCED VERDICT AFTER GRANTING THE MOTION."

Claim (b) of special interrogatory No. 2 was for the extra costs in processing the Houghton timber sales contract.

Claim (c) was for the inability to process other timber sales while processing the Houghton timber contract.

For the purpose of this argument we assume Duke City exercised economic compulsion on Terrel and that that compulsion caused Terrel to process the Houghton sale against his will.

Nevertheless, Terrel did not prove damages. He had the burden of proving the additional profits from processing sales other than Houghton. He also had to show costs incurred in processing the other sales which would not be incurred in processing Houghton. Specifically, he had the burden of proving the amount of damages the Forest Service would have assessed when he breached the Houghton sale in order to process the more profitable sales. Allen, Heaton & McDonald, Inc. v. Castle Farm Amusement Co., 151 Ohio St. 522, 86 N.E.2d 782, 17 A.L.R.2d 963 (1949); United States v. Behan, 110 U.S. 338, 4 S.Ct. 81, 28 L.Ed. 168 (1884); also see Bank of New Mexico v. Rice, supra. The burden is thus allocated because presumably Terrel had greater access to the evidence on damages under the Forest Service contract, and those damages were an element of the cost of operation, like the cost of cutting and milling. Those costs must be proven to show lost profits.

The evidence disproves Terrel's assertion that the Forest Service would have assessed no damages. He offered no proof as to the amount of those damages. He therefore did not meet the burden of proof. Pentecost v. Hudson, 57 N.M. 7, 252 P.2d 511 (1953).

Terrel also claims that the losses from processing the Houghton sale so enervated him financially that he lost the opportunity to process other contracts before they expired. (See "Timber Contracts", supra). To prove this claim he had to show that the losses from processing Houghton would be greater than the losses from processing other sales, or the profits less. If he did not show this he could not prove that the Houghton processing caused the financial paralysis. How could he prove causation if the profit or loss would be the same, whichever sale he processed? While a composite of activities by Duke City may have caused this loss (see defendant's first point, B) Terrel did not make that contention.

As shown above Terrel did not prove that his profits were smaller or his losses greater in processing Houghton. He therefore did not prove the Houghton processing caused his inability to process the other sales.

Plaintiff's second point on the cross-appeal is:

"THE TRIAL COURT ERRED IN EXCLUDING THE TESTIMONY OF PLAINTIFF'S ACCOUNTANT TO ESTABLISH LOST PROFITS FOR INABILITY TO OPERATE PLAINTIFF'S PLANER DURING THE TWO WEEKS THAT IT WAS SHUT DOWN FOR UNNECESSARY REPAIRS."

Defendant asserts plaintiff did not preserve this point for appeal. Plaintiff in his reply brief states:

"In answer to the above contention, Cross Appellee first argues that there was no formal offer of proof of the testimony to be elicited and therefore no preservation of the error. It is true that this particular item of appeal would not ordinarily in and of itself require a reversal. Cross Appellant does not argue that it would. Cross Appellant does argue, however, that in the event the Court reverses for trial on the point argued in Point III herein, or for any other reason, then the item of damage discussed under this particular Point II should also be considered by the Trial Court on the new trial."

Since we do not reverse for a new trial we need not answer this point.

Plaintiff's third point on the cross-appeal is:

"THE TRIAL COURT ERRED IN EXCLUDING TESTIMONY OF PLAINTIFF'S ACCOUNTANT TO ESTABLISH THE DIFFERENT PERCENTAGES OF GRADES AND SIZES OF LUMBER INCLUDED IN SHORTAGES, i. e. THE DIFFERENCE BETWEEN LUMBER SENT TO DUKE CITY AND LUMBER ACCOUNTED FOR BY THEM, THE PERCENTAGES BEING BASED UPON ACTUAL EXPERIENCE AND BEING A PREREQUISITE TO THE INTRODUCTION OF EVIDENCE ESTABLISHING DAMAGES FOR THE SHORTAGE."

Terrel introduced evidence showing that Duke City failed to account for the "built-in" Forest Service scaling overrun in their grade and tally (see "Overrun," supra). However, since Terrel himself did not grade and tally the rough green lumber leaving his mill (see "Contract," supra) he attempted to estimate the amount and price of the shorted lumber of each grade to arrive at a damage figure. He tendered evidence under three theories to show the amount of lumber of each of the two general grades, upper and common. The first two theories were essentially the same. They were derived from the Duke City accounts of rough green lumber received from Terrel during the eleven month contract period. The third theory was based on mill run studies performed by Duke City at Terrel's mill during the contract period. Grade percentages under this theory differed significantly from those under the other theories.

The trial court rejected all the theories as speculative. One reason given for this ruling was that the theories did not show when the shortages occurred.

Terrel then tendered evidence showing that 491,228 board feet of shortage, or approximately sixty-three percent, occurred in two and one-half months at the end of the eleven month contract term. Again the court refused to admit the evidence.

Finally, Terrel proposed to use " * * * the average price of common lumber during the period of time from June nineteenth * * * " to show the monetary loss during the contract term. The court refused that tender.

We will not disturb these rulings by the trial court " * * * absent a patent abuse or manifest error in the exercise of [his] discretion." Hanberry v. Fitzgerald, 72 N.M. 383, 384 P.2d 256 (1963). The amount of damage need not be proven with certainty. But in actions for breach of contract " * * * the amount allowed must be subject to reasonable ascertainment." Louis Lyster, Gen. Con., Inc. v. Town of Las Vegas, 75 N.M. 427, 405 P.2d 665 (1965).

Market prices for lumber varied greatly during the contract period and the contract price varied with the market. The time when the alleged shortages occurred would substantially affect the amount of damages. Terrel's first three tenders assumed that the shortages occurred uniformly during the contract period. His fourth tender, on the other hand, shows that sixty-three percent occurred in the last three months, when prices were the lowest. Terrel's evidence on the crucial element of when the shortages occurred was in conflict. Any resolution of that conflict would be speculative.

Terrel's first two attempts to show the percentage split between rough green uppers and commons produced entirely different figures than his third attempt. This conflict added another element of speculation.

Also, in applying a price to the shorted lumber Terrel proposed to use the "average price." There is no tendered evidence indicating that he would "weight" that average by the amount of lumber sold at each price. Because the market was in such flux, this omission added yet another element of speculation.

While these speculative elements may not be individually fatal, they have combined in this case to push the proof beyond the limit of reasonable ascertainment. We distinguish this case from Bokum v. Elkins, 67 N.M. 324, 355 P.2d 137 (1960); Hubbard v. Goode, 65 N.M. 263, 335 P.2d 1063 (1959); Rudolph v. Guy, 61 N.M. 284, 299 P.2d 462 (1956); Pendergrass v. Lovelace, 57 N.M. 661, 262 P.2d 231 (1953) and Nichols v. Anderson, 43 N.M. 296, 92 P.2d 781 (1939), on the basis of the cumulative speculation aspect in the instant case.

The judgment of the trial court is affirmed.

It is so ordered.

LOPEZ, J., concurs.

HERNANDEZ, J., specially concurs.

HERNANDEZ, Judge (concurring in the result).

I agree with much of the analysis in the opinion of the court. However, there are two things with which I cannot agree and two where further explanation is necessary.

Although it is implicit in the opinion that the doctrine of economic compulsion should be classified as a tort action, I believe that it should be made explicit to avoid confusion as to what procedural rules should apply, etc.

I would define "duty" as the obligation to reasonably exercise superior economic power or advantage in a bargain situation. 53 Iowa L.Rev., supra.

The opinion in the discussion on damages states: "However, the consequential damages must be damages that were or should have been reasonably contemplated by the parties." I agree that the "foreseeability" rule prevails in this state. However, it is also the rule that one who willfully commits a tort is liable for all injury resulting from such wrongful act, even though such resulting injury could not

have reasonably been foreseen. Valdez v. Gonzales, supra. The actions of Duke City were willful.

Many courts do deny recovery under economic compulsion because the victim had an adequate legal remedy on the principle of maintaining the stability of contracts. In my opinion the position of the victim of economic compulsion and the victim who has been induced by fraudulent means to enter into a contract are analogous. The law gives the fraud victim an election of remedies. "Although relief may be obtained by a defrauded party to a contract in a variety of ways, such relief is always based on any of three general remedies which are open to the defrauded party: 1. A right to damages for being led into the transaction. * * * 2. Recision of the fraudulent transaction * * * 3. Enforcement against the fraudulent person of the kind of bargain which he represented that he was making * * *" 12 Williston, Contracts, § 1523, at 606–607 (3d ed. 1970). I believe that the victim of economic compulsion should also be given an election of remedies. The security of contracts has not been endangered by recognizing the demands of good faith and fair dealing in situations of fraud. Neither will the security be endangered by responding to the elementary fair dealing demands of the victims of economic compulsion.

A New Jersey court faced with the argument that the victim had the legal remedy of recission had this to say:

"An attempt has been made to justify the rule stated, upon the ground that the person exerting the duress has relied on the payment made to him by the victim, and having relied, he should be protected. [Citation omitted] But why should the law have such a tender regard for a wrongdoer? Relief by way of restitution puts no undue burden upon him; he is not subjected to damages for his wrong, but merely called upon to give back that which he forced from his victim." S. P. Dunham Company v. Kudra, 44 N.J.Super. 565, 131 A.2d 306 (1957).

## OPINION ON MOTION TO REMAND

HENDLEY, Judge.

Pending the appeal of this cause defendants filed a motion requesting " * * * an Order remanding this cause to the Trial Court, for the purpose of allowing Duke City to file, in the Trial Court, a motion pursuant to N.M.R.Civ.P. 60(b)(6), to grant relief from the operation of the Judgment herein insofar as it awards damages for an alleged loss of the sawmill and planing mill belonging to Plaintiff, William E. Terrel, d/b/a Little Tree Lumber Company (hereinafter referred to as "Terrel"), for the reason that Terrel has not lost his sawmill and planing mill. * * * " Attached to defendants' motion is an Affidavit of the Executive Vice President of Duke City Lumber Company and a certified copy of a financing statement showing plaintiff as debtor after the date of judgment awarded by the Trial Court.

Since Rule 60(b)(6) applies to the district courts, the first question that presented itself was whether this court should entertain such a motion or whether the matter should have been presented directly to the Trial Court. It is our opinion that the Trial Court could not have considered the motion having lost jurisdiction by reason of the appeal. Therefore if we would not consider the motion the defendants would in effect be foreclosed from seeking relief under this rule. We believe that no party should be deprived of the benefits of this relief because a case is on appeal. Therefore it is our determination that the filing of the motion in this court was proper.

We are mindful that the rule may be invoked only upon a showing of exceptional circumstances, (Battersby v. Bell Aircraft Corporation, 65 N.M. 114, 332 P.2d 1028 (1958)) and that we should only remand in those cases where it is reasonably apparent that the Trial Court would be disposed to grant such a motion. Baruch v. Beech Aircraft Corporation, 172 F.2d 445 (10th Cir. 1949).

After having read the briefs and other information furnished and heard the arguments of counsel we were not prepared to rule without further information. This then presented the question of whether this court should hear testimony, receive evidence, etc., which we are not adequately staffed to do or remand the entire case even though it was not reasonably apparent to us that the trial court would grant the motion. We decided instead to seek an expression of opinion from the trial court. See Switzer v. Marzall, 95 F.Supp. 721 (D.C.D.Cir.1951). Our reasoning being that in this case the trial court, having heard the original trial and motions, was more familiar with the facts of the case and was the appropriate court to determine the question of relief under Rule 60(b)(6). We issued an order which states in part:

"IT IS ORDERED That the Court is reserving a ruling on movant's motion to remand and directs the movant to file a motion with the trial court requesting an expression of opinion as to whether the trial court would entertain a motion under Rule 60(B)(6). After hearing before the trial court, movant is directed to file the trial court's expression of opinion with the Court of Appeals."

Subsequently, the trial court held a hearing and issued an "Expression of Opinion" which stated:

"Assuming jurisdiction for this purpose, the court would not entertain a Motion under Rule 60(B)(6)."

Explicit in the Trial Court's "Expression of Opinion" is that defendants' motion, attached exhibits and arguments of counsel presented no basis for relief from the operation of the judgment.

In view of the foregoing, defendants' Motion to Remand is denied.

It is so ordered.

HERNANDEZ, J., concurs.

SUTIN, J., dissents.

SUTIN, Judge (dissenting).

I dissent. I believe the motion to remand should by tabled.

On May 15, 1972, defendants filed their brief in chief as appellants. On May 18, 1972, Duke City filed a motion to remand for the purpose of allowing defendants to file in the trial court a motion pursuant to Rule 60(b)(6) [§ 21–1–1(60)(b)(6), N.M. S.A.1953 (Repl.Vol. 4)]. This rule provides in part:

> On motion and *upon such terms as are just,* the court may relieve a party * * * from a final judgment * * * for the following reasons:
>
> * * * * * *
>
> (6) any other reason justifying relief from the operation of the judgment. [Emphasis added].

Duke City sought a remand to allow the trial court to grant relief from the operation of the judgment insofar as it awarded damages to plaintiff for an alleged loss of the sawmill and planing mill.

This court reserved a ruling and directed the movant to file its motion under Rule 60(b)(6), supra, with the trial court requesting an expression of opinion whether it would entertain a motion under Rule 60(b)(6), supra. The motion was filed and argument made. On June 30, 1972, the trial court expressed its opinion that it would not entertain a motion under Rule 60(b)(6). The trial judge is the Chief Judge of this court.

On July 20, 1972, upon rehearing of the motion to remand, Duke City orally requested that the motion be tabled until a decision was arrived at on the merits. The reason given was that the motion was premature because the judgment of the trial court might be reversed on appeal. The majority of this court denied the motion to remand.

This is a novel proceeding in the Court of Appeals.

Section 21–2–1(16)(1), (2), N.M.S.A. 1953 (Repl.Vol. 4) provides that motions shall be typewritten; that a motion directed to a matter which may substantially affect the disposition of the case must be supported by a separate brief. No provision is made specifically for a motion to remand without decision pending appeal. In my opinion, a motion to remand is included in the above rules if it is directed to a matter which may substantially affect the disposition of the case.

Rule 17 [§21–2–1(17), N.M.S.A.1953 (Repl.Vol. 4)] provides for disposition for cause. We must examine the record, and *on the facts therein contained alone,* we must award a new trial, reverse or affirm the judgment of the district court, or give such other judgment as to us shall be deemed agreeable to law.

Rule 52(B)(a)(7) [§ 21–1–1(52)(B)(a) (7), N.M.S.A. 1953 (Repl.Vol. 4)], which pertains to findings of fact is the only reference to remand in our statutes. It provides in part:

> * * *, [B]ut where *the ends of justice* require the cause may be remanded to the district court for the making and filing of proper findings of fact and conclusions of law. [Emphasis added].

This was a jury trial and Rule 52(B)(a)(7), supra, is inapplicable, but the rule sets a tone for us to hear on motions to remand without decision in jury trials.

The "ends of justice" is the controlling issue in determining the grant or denial of a motion to remand. For "ends of justice," see Smith v. South, 59 N.M. 312, 283 P.2d 1073 (1955); ATMA v. Munoz, 48 N.M. 114, 146 P.2d 631 (1944); Prater v. Holloway, 49 N.M. 353, 164 P.2d 378 (1945); Edington v. Alba, 74 N.M. 263, 392 P.2d 675 (1964); 5B C.J.S. Appeal & Error § 1836g.

The general rule on remand to permit further evidence is set forth in 5B C.J.S. Appeal & Error § 1836d:

> Where necessary to the furtherance of justice, a case on appeal may be remanded, without decision, for the introduction of further evidence.

Duke City did not request a remand for the introduction of further evidence. It sought a hearing in the trial court under Rule 60(b)(6), supra. If it would seek a

remand for the introduction of further evidence, I would favor a remand.

The case at issue is extensive in testimony, complex in the law, and lengthy in written briefs. The jury returned a verdict for plaintiff in the sum of $635,458.50, $367,000 of which Duke City claims was for "loss" of plaintiff's sawmill and planing mill. It will take an unusually long time to decide the issues. If, at the time of decision on the merits, this court believes the judgment should be affirmed, it will consider only the facts in this transcript.

The motion to remand should be kept alive and should be seriously considered. Duke City will have no knowledge of the proposed opinion of this court. After the opinion is rendered, Duke City will have no opportunity to present a motion to remand in order to preserve error, if any, on application to the Supreme Court on writ of certiorari. Furthermore, this court will not know at the time of affirmance on the facts contained in the record, whether the judgment is fair and correct.

Duke City claims plaintiff did not lose his sawmill or planing mill because on May 8, 1972, over one year after judgment was rendered, plaintiff's sawmill was definitely in operation. We have no basis upon which to determine whether evidence produced under Rule 60(b)(6), supra, will affect the award of damages or award a new trial on the issue. The "ends of justice" demand that the motion to remand be tabled. If this court intends to affirm the judgment, the motion to remand should be granted with instructions to the trial court to grant or deny a motion made under Rule 60(b)(6), supra. The record can then be brought to this court by supplemental transcript.

It is obvious the trial court will deny any motion made under Rule 60(b)(6), supra. By supplemental transcript, this claimed error can then be raised by Duke City under a petition for writ of certiorari to the Supreme Court. There is no injustice in preserving claimed error on matters which arose after an appeal was taken to this court. We are not concerned with evidence that could have been presented before judgment.

The purpose of this test is not to harm plaintiff. The time may come when a plaintiff may seek similar relief.

A rule should be adopted which will serve the ends of justice in the future.